IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CV-313-FL

| | | |
|---|---|---|
| MARTIN MARIETTA MATERIALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| ACE AMERICAN INSURANCE COMPANY and ACE PROPERTY AND CASUALTY INSURANCE COMPANY, | ) ) ) ) | |
| Defendants. | ) | |
| - - - - - | | |
| ACE AMERICAN INSURANCE COMPANY and ACE PROPERTY AND CASUALTY INSURANCE COMPANY, | ) ) ) ) | |
| Counterclaim Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| MARTIN MARIETTA MATERIALS, INC., | ) ) ) ) | |
| Counterclaim Defendant. | ) ) | |

This matter is before the court on defendants' motion for summary judgment. (DE 39). Also pending are plaintiff's motion to exclude defendants' expert (DE 33) and defendants' motions to exclude plaintiff's experts (DE 35, 37). The motions have been briefed fully, and in this posture, the issues raised are ripe for ruling.

**STATEMENT OF THE CASE**

Plaintiff initiated this action May 1, 2023, with complaint filed in the Superior Court of Wake County, North Carolina, (see DE 1-1 at 4), bringing claims for common law breach of duty of good faith and fair dealing, violation of the Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat § 75-1.1 (the "UDTPA"), and declaratory judgment regarding the defendants' handling of a liability insurance claim.

Defendants filed notice of removal June 13, 2023, asserting diversity jurisdiction pursuant to 28 U.S.C. § 1332. Defendants then filed answer and counterclaim, alleging breach of contract and seeking reimbursement with interest. Plaintiff timely filed answer to counterclaim.

Following a period of discovery, defendants filed the instant motion for summary judgment relying upon statement of material facts and appendix, including the following exhibits and categories of exhibits: 1) declaration of defendants' employee Brittney Shelton ("Shelton"); 2) deposition testimony by plaintiff's defense attorney Mark E. Stradley ("Stradley"), defendants' employees Russell J. Smith ("Smith") and Christine Song ("Song"), plaintiff's corporate representative Malcolm Cox ("Cox"), plaintiff's in house counsel Kyle Jackson, fact witnesses in underlying matter Gregory Conway, Russell Collins, and Salvador Sanchez, and expert witness in underlying matter Bruce Markman, M.D.; 3) email correspondence among plaintiff's and defendants' employees and with defendants' outside counsel Todd Parks ("Parks"); and 4) documents including collateral agreement, pretrial report, case evaluation, and pre-trial summary.

Plaintiff responded in opposition, relying upon statement of material facts and appendix including the following exhibits or categories of exhibits: 1) deposition testimony by Cox, Song, Stradley, Shelton, Parks, Smith, plaintiff's employee Wayne Phears, defendants' employee Brian Farrell, defendants' expert Gary D. Stephen ("Stephen"), and plaintiff's expert Mark Ticer

2

("Ticer"); 2) emails among defendants' employees; 3) letters between the parties; 4) reports by Stradley, Parks, and Shelton; and 5) documents including Chubb Casualty guidelines, claim notes, settlement agreement and releases, deductible endorsements, appellee's brief in unrelated case, defendants' supplemental discovery responses, and a meeting request. And in their reply, defendants refer to emails among the parties' employees and outside counsel, deposition of Shelton, and letter from Cox to Shelton.

Plaintiff's instant motion to exclude the expert report and testimony of Stephen relies upon Stephen's expert report, deposition testimony by Stephen, Song, Stradley, and Parks, emails from defendants' appellate counsel Jessica Barger and Shelton, case evaluation, reservation of rights letter, pre-trial summary, and defendants' disclosure of expert testimony. In opposition, defendants refer also to deposition testimony of Stephen, a proposed jury charge, and a trial report.

Defendants' instant motion to exclude the expert report and testimony of Ticer relies upon Stephen's expert report, plaintiff's expert disclosure, and deposition testimony and expert rebuttal report by Ticer. With its opposition, plaintiff resubmitted deposition testimony by Ticer. Defendants' reply includes reference to deposition testimony by fact witnesses in underlying matter Amanda Boggan and John Litwiler and two daily trial reports.

Defendants' instant motion to exclude the expert report and testimony of Charles Miller ("Miller") relies upon Stephen's expert report, plaintiff's expert disclosure, and expert rebuttal report and deposition testimony by Miller. In opposition, plaintiff references deposition testimony by Miller, Stephen, and Song and emails from Shelton, Song, and Farrell. Defendants replied.

### STATEMENT OF UNDISPUTED FACTS

The undisputed facts as pertinent to the analysis herein may be summarized as follows.

3

A.  The Policy

Plaintiff obtained from defendants a primary liability insurance policy number HDO G71448368 (the "policy") for the period September 30, 2019, to September 30, 2020. (DE 48 ¶ 1; see DE 1-1 at 31-251).[1] Plaintiff also obtained from defendants an umbrella liability policy number G28167581 004 (the "umbrella policy") for the same time period. (DE 48 ¶ 4, see DE 1-1 at 253-350). The umbrella policy was intended to activate in the event of a loss in excess of the policy's $3 million liability limit. (DE 48 ¶ 1). The parties agree as to the validity of the policy and the umbrella policy. (DE 48 ¶ 8).

In its "Commercial General Liability Coverage Form," the policy includes the following relevant provision:

> **1. Insuring Agreement**
>
> **a.** [Defendants] will pay those sums that [plaintiff] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. [Defendants] will have the right and duty to defend [plaintiff] against any "suit" seeking those damages. . . . [Defendants] may, at [their] discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

(DE 1-1 at 105).

The policy also includes the following terms in its "Reimbursement of Deductible Endorsement":

> **I) DEDUCTIBLE AMOUNT**
>
>     1) Deductible Amount:    $3,000,000
>
> * * *

---

[1] Where a fact asserted in the movants' statement of material fact is undisputed, the court cites to the opposing party's responsive statement of facts, where it indicates the fact is admitted, undisputed, or without opposing fact. Unless otherwise specified, page numbers in citations to the record in this order refer to the page number of the document designated in the court's case management and electronic case filing (CM/ECF) system, and not to page numbering, if any specified on the face of the underlying document.

4

Case 5:23-cv-00313-FL   Document 56   Filed 07/15/25   Page 4 of 18

II) ADDITIONAL PROVISIONS

    1) [Defendants] will pay all sums that [defendants] become legally obligated to pay up to the Limits of Insurance under this policy.

    2) [Plaintiff] must reimburse [defendants] up to the Deductible Amount for any amounts [defendants] have paid under this policy.

(DE 1-1 at 147).

B.    The Underlying Action

On June 10, 2020, Travis Eckert ("Eckert") suffered bodily injuries as the result of a collision of a railcar on which he was riding and a front-end loader operated by an employee of plaintiff. (DE 48 ¶¶ 10-14). Eckert's injuries included three amputated toes, a broken ankle, and a shoulder injury requiring surgery. (Id. ¶ 20). Eckert and his wife subsequently filed a lawsuit against plaintiff and Eckert's employer September 24, 2020, seeking to recover damages for Eckert's injuries (the "underlying action"). (Id. ¶ 16); see Eckert v. Martin Marietta Materials, Inc., et al., No. DC-20-13980 (Dallas Cnty., Tex.). The Eckerts alleged over $2.1 million in economic damages and sought non-economic damages for pain and suffering, mental anguish, impairment, disfigurement, and loss of consortium. (DE 48 ¶¶ 30-31).

Plaintiff submitted a claim loss report of the underlying action to defendants January 20, 2021. (DE 48 ¶ 18). Shelton served as defendants' lead adjuster for the underlying action. Defendants assert they refrained from taking over plaintiff's defense and instead chose to collaborate with plaintiff and its chosen counsel. (Defs' SMF ¶ 62). Plaintiff asserts defendants delegated defense responsibility to plaintiff. (DE 48 ¶ 62)

In the underlying action, plaintiff was represented by outside counsel Stradley, with whom it had a longtime relationship. (Id. ¶ 19). Stradley issued a report March 14, 2022, indicating the Eckerts' settlement demand was $4.4 million. (Id. ¶ 21). Although he acknowledged that cases involving railroads often result in multi-million dollar verdicts, Stradley believed a verdict under

5

$1 million was a reasonable goal. (Id. ¶¶ 22-23). Stradley intended to pursue a comparative negligence defense, asserting Eckert was riding on the wrong side of the train car, should have been wearing steel-toed boots, and should have seen the impending collision. (Id. ¶¶ 24-25). In his pretrial report, Stradley stated "this comparative negligence, if any, would likely be 10% to 30%." (Id. ¶ 28).

Defendants assert they believed Stradley's report undervalued the damages and risks. (DE 41 ¶ 35). Through Shelton, defendants issued a reservation of rights letter to plaintiff April 1, 2022, approximately 14 months after they were informed of the underlying action. (See DE 34-9).

Defendants asked outside attorney Parks, with whom they had worked before, to assist with the underlying action July 25, 2022. (DE 49 ¶ 29). Defendants assert they enlisted Parks to provide a second opinion as to the value of the Eckerts' claims, but plaintiff contends Parks was hired to endorse defendants' inflated valuation of the claims. (DE 48 ¶ 29). On August 1, 2022, defendants' senior claims manager Song advised plaintiff that Parks agreed with Defendants' evaluation of the underlying action. (DE 49 ¶ 28). Defendants also hired appellate counsel and a jury consultant, but the parties dispute the reasoning for these hires as well. (Id. ¶ 66).

Parks issued a report March 2, 2023, in which he opined "there is a very slight chance of a verdict under $1 million. Likewise, I believe there is a slight chance of a verdict in excess of $4 million. I believe a reasonable verdict value for this matter falls in the $2 to $3 million range." (DE 48 ¶ 32; see DE 41-3 at 7).

On March 3, 2023, the Eckerts made a settlement demand of $2.825 million. (DE 48 ¶ 44). In a letter from Shelton dated March 6, 2023, defendants advised plaintiff that "[i]f [plaintiff] refuses to re-engage in settlement negotiations and offer substantially more than what has currently been offered, [defendants] will exercise [their] duty to settle the claim within the deductible,

including but not limited to, undertaking settlement negotiations directly with the Eckert's." [sic] (DE 1-1 at 353). Plaintiff subsequently countered with an offer of $500,000.00, and the Eckerts lowered their demand to $2.75 million March 7, 2023. (Id. ¶ 46). Plaintiff rejected this demand without a counter. (Id. ¶ 48). Defendants subsequently decided to take control of the settlement negotiations March 10, 2023. (DE 48 ¶ 49).

Plaintiff and defendants held a phone call March 11, 2023, to discuss the settlement negotiations. (DE 49 ¶ 41). Plaintiff expressed its belief that defendants did not justify their position on the settlement, and defendants pointed to a recent multimillion dollar verdict in another Texas county. (Id. ¶ 43). The next day Smith, a Senior Vice President at defendant Ace American Insurance Company, approved settlement authority of $2 million. (DE 48 ¶ 53). Smith testified that defendants "always considered the interest of the insured" when negotiating a settlement. (Id. ¶ 61). The Eckerts rejected defendants' $2 million offer. (Id. ¶ 55).

Trial in the underlying action began March 13, 2023. (Id. ¶ 56). At that point defendants suggested a high-low settlement proposal, which the Eckerts refused. (Id.). During opening statements, the Eckerts' counsel stated that he would seek damages between $9 and $12 million. (DE 48 ¶ 34). Plaintiff's coverage counsel advised defendants of plaintiff's position that any settlement without plaintiff's consent would be a "voluntary payment by [defendants] and not recoverable from [plaintiff]." (DE 49 ¶ 47).

On the second day of trial, March 14, 2023, Smith increased defendants' settlement authority to $2.5 million. (DE 48 ¶ 58). The Eckerts rejected an offer of $2.25 million but eventually agreed to $2.5 million. (Id. ¶¶ 59-60). Defendants paid the $2.5 million settlement and sought reimbursement from plaintiff, which plaintiff refused. (DE 48 ¶¶39-40).

7

# DISCUSSION

A.       Motion for Summary Judgment

    1.       Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, ... and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

2. Analysis

Defendants argue they are entitled to summary judgment on each of plaintiff's claims as well as on their counterclaim. The court examines each claim in turn below.

a. Duty of Good Faith (Count I)

Plaintiff argues defendants breached their duty of good faith by failing to give adequate consideration to plaintiff's interests when defendants negotiated and executed the settlement agreement with the Eckerts. Defendants argue they gave appropriate consideration to plaintiff's interest in settling the underlying action. The court agrees with defendants.

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985). More specifically, North Carolina "law imposes on the insurer the duty of carrying out in good faith its contract of insurance," including the insurer's "right to effectuate settlement." Alford v. Textile Ins. Co., 248 N.C. 224, 229 (1958); see Nationwide Mut. Ins. Co. v. Pub. Serv. Co. of N.C., 112 N.C. App. 345, 350 (1993)

9

(hereinafter "Pub. Serv. Co.") ("Regardless of any contractual provision reserving to the insurer the exclusive right to settle a claim as it sees fit, any settlement must be made in good faith.").

In the context of settling a claim against an insured,

> a cause of action alleging breach of good faith will not lie when the insurer settles a claim within the monetary limits of the insured's policy; however, in doing so, . . . the insurer has the duty to consider the insured's interest. . . . [A]n insurer may act in its own interest in settlement of the claim.

Cash v. State Farm Mut. Auto. Ins. Co., 137 N.C. App. 192, 205 (2000), aff'd 353 N.C. 257 (2000). Additionally, bad faith does not arise where there is an "honest disagreement" regarding the value of a claim. Lovell v. Nationwide Mut. Ins. Co., 108 N.C. App. 416, 421 (1993).

Contrary to plaintiff's assertion, the law does not require insurers to give equal consideration to the interests of their insured. See Pub. Serv. Co., 112 N.C. App. at 350 ("The insurer must give due regard to the interests of the insured, but this does not mean that the insurer must give more consideration or weight to the interests of the insured than its own interests."); Abernathy v. Utica Nut. Ins. Co., 373 F.2d 565, 570 (4th Cir. 1967) ("good faith requires that the insurer take into consideration the insured's interest as well as its own when making decisions as to settlement").[2] Plaintiff has not pointed to any binding authority mandating that an insurer place its insured interests ahead of its own in negotiating settlements.

Accordingly, defendants here owed plaintiff a duty of good faith in carrying out the terms of the policy, including a duty to consider plaintiff's interest when settling the claims in the underlying action.

Defendants assert they considered plaintiff's interest when they continued negotiations beyond the first settlement demand under the $3 million deductible. The undisputed evidence

---

[2] Throughout this order, internal citations and quotation marks are omitted from citations, unless otherwise specified.

10

shows defendants did not force plaintiff to accept the Eckerts' $2.825 million demand made March 3, 2023. (DE 48 ¶ 44). Nor did defendants accept the Eckerts' $2.75 million demand when defendants took control of settlement negotiations March 10, 2023. (Id. ¶ 38).

Although plaintiff argues that this was done only in defendants' interest, the only evidence plaintiff offers in support is its March 13, 2023, letter indicating that plaintiff would not reimburse defendants for settlements paid over plaintiff's objection. (DE 48-12 at 5). According to plaintiff, this letter put defendants on notice that they were negotiating with their own money. Even if this letter convinced defendants that they were negotiating with their own money rather than plaintiff's, it does not explain any interest of defendants that was advanced in allowing negotiations to continue between the March 3, 2023, demand and the March 13, 2023, letter, when defendants had no plausible reason to believe plaintiff would not reimburse a settlement payment. The only reasonable conclusion is that defendants considered plaintiff's interest in paying a smaller portion of its deductible. Such consideration is sufficient to fulfill defendants' duty of good faith. See Cash, 137 N.C. App. at 205.

Therefore, because the undisputed evidence shows that defendants considered plaintiff's interest when negotiating and executing a settlement agreement within the policy's limits, defendants are entitled to summary judgment as to the bad faith claim.

    b.  Declaratory Judgment (Counts II and III)

Plaintiff seeks a declaratory judgment that defendants' $2.5 million settlement of the underlying action was a voluntary payment (Count III) and that defendants are therefore not entitled to reimbursement of settlement-related expenses under the terms of the policy (Count II). The "interpretation of an insurance policy is a question of law" for the court. State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am., 343 F.3d fex249, 254 (4th Cir. 2003); Accardi v.

11

Case 5:23-cv-00313-FL  Document 56  Filed 07/15/25  Page 11 of 18

Hartford Underwriters Ins. Co., 373 N.C. 292, 295 (2020). Because the arguments regarding reimbursement depend in part on whether the payment was voluntary, the court first addresses count III.

### i.      Voluntary Payment (Count III)

"A payment made under compulsion is not voluntary; payment made under a moral obligation, or in ignorance of the real state of facts, or under an erroneous impression of one's legal duty, is not a voluntary payment." Boney v. Cent. Mut. Ins. Co. of Chi., 197 S.E. 122, 126 (N.C. 1938). A settlement agreement is a contract and is therefore "governed by general principles of contract law." Chappell v. Roth, 353 N.C. 690, 692 (2001). Additionally, "where an insurance company has entered into a settlement agreement on behalf of the insured pursuant to a liability insurance policy, unless otherwise clearly agreed, the insurance company is liable for the insured's total obligation under that agreement, subject to the monetary limits of the policy." Cnty. of Guilford v. Nat'l Union Fire Ins. Co. of Pittsburgh, 108 N.C. App. 1, 6 (1992) aff'd, 333 N.C. 568 (1993).

Here, the policy provides that defendants "may at [their] discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result." (DE 1-1 at 105). This provision gives defendants the right to settle any bodily injury suit against plaintiff, including the underlying action. See Marks v. Thompson, 282 N.C. 174, 185 (1972) ("[T]he insurer . . . has the right and the obligation to defend the action against its insured and to conduct negotiations for settlement."); Cash, 137 N.C. App. at 205 ("[A]n insurer may act in its own interest in settlement of the claim."). Defendants exercised this right by negotiating a settlement with the Eckerts. At that point, defendants became "liable for the insured's total obligation under that agreement, subject to the monetary limits of the policy." Cnty. of Guilford, 108 N.C. App. at 6. Accordingly, the payment

was not voluntary.

Plaintiff's argument that defendants offer other deductible endorsements for some policy holders is unpersuasive. "If the terms of the policy are plain, unambiguous, and susceptible of only one reasonable interpretation, a court will enforce the contract according to its terms." ABT Building Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 472 F.3d 99, 115-16 (4th Cir. 2006). Here, the policy clearly and unambiguously gives defendants "discretion" to "settle any claim or 'suit.' " (DE 1-1 at 105). Plaintiff has not identified any ambiguous language limiting that discretion. There is therefore no basis to look beyond the terms of the policy.

Further, plaintiff's argument that defendants were not legally obligated to settle the underlying action is immaterial. The pertinent question is whether defendants' payment, not the underlying settlement, was voluntary. Regardless of whether defendants were obligated to settle, they had a right to do so under the policy. (See DE 1-1 at 105); Marks, 282 N.C. at 185. After executing the settlement agreement, defendants became obligated to pay the settlement amount. See Cnty. of Guilford, 108 N.C. App. at 6. Therefore, at the time defendants paid the Eckerts $2.5 million, such payment was not voluntary.

Shew v. S. Fire & Cas. Co., 307 N.C. 438 (1983) is distinguishable. In that case, the court held that an insurer was not legally obligated to pay its insured criminal restitution because such a holding "would be tantamount to condoning insurance against the results and penalties of one's own criminal acts," which "is against public policy." Id. at 444. Because the instant matter does not involve payment of criminal restitution, the public policy concerns addressed in Shew are absent, and plaintiff's reliance thereon is misplaced.

In sum, because defendants were liable for plaintiff's obligations under the settlement agreement, their payment to the Eckerts was not voluntary. Accordingly, defendants are entitled

to summary judgment as to count III.

### ii. Reimbursement of Settlement Expenses (Count II)

Plaintiff argues it is not required to reimburse defendants because defendants did not properly consider plaintiff's interest when settling the underlying action without plaintiff's consent.[3] Defendants argue that the policy grants them the discretion to settle claims and requires plaintiff to reimburse them for amounts paid within the deductible. The court agrees with defendants.

The parties agree that defendants' demand for reimbursement is governed by the policy's "Reimbursement of Deductible Endorsement." (DE 49 ¶¶ 5-6). Under that endorsement, "[defendants] will pay all sums that [defendants] become legally obligated to pay up to the Limits of Insurance under this policy," and "[plaintiff] must reimburse [defendants] up to the Deductible Amount for any amounts [defendants] have paid under this policy." (DE 1-1 at 147).

Accordingly, because defendants paid the settlement amount for the Eckerts' claims under the policy, plaintiff "must reimburse [defendants] up to the Deductible Amount." (Id.). The policy does not require that plaintiff reimburse defendants for amounts defendants were "legally obligated to pay." Rather, the plain language clearly requires plaintiff to "reimburse [defendants] . . . for <u>any amounts</u> [defendants] have paid under this policy." (Id.) (emphasis added). Nor does the policy condition reimbursement on plaintiff's consent to settlement. By accepting the terms of the policy, plaintiff agreed that defendants "may, at [their] discretion, . . . settle any claim or 'suit.'" (DE 1-1 at 105). Therefore, defendants had authority to settle the underlying action, and plaintiff is not excused from reimbursing them.

---

[3] Plaintiff also argues it is not required to reimburse defendants because their settlement payment was voluntary. Because the court determines the payment was not voluntary, it does not address this argument.

14

c.      UDTPA (Count IV)

Plaintiff alleges defendants have an unfair trade practice of settling cases within a policyholder's deductible and for an inflated amount that exceeds the case's settlement value. Defendants argue plaintiff has not offered evidence sufficient to show that defendants committed an unfair or deceptive practice.[4]

North Carolina declares as unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). "In order to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Dalton v. Camp, 353 N.C. 647, 656 (2001).

"The determination of whether an act or practice is an unfair or deceptive practice that violates [N.C. Gen. Stat.] § 75-1.1 is a question of law for the court." Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68 (2000). An act or practice is "unfair" if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 72 (2007). An act or practice is "deceptive" if it has "the capacity or tendency to deceive." Id. "[W]here a party engages in conduct manifesting an inequitable assertion of power or position, such conduct constitutes an unfair act or practice." Gray, 352 N.C. at 68. Unfair practices in the insurance industry in North Carolina are further governed by North Carolina General Statute § 58-63-15(11), which enumerates certain unfair claim settlement practices. Id. "[T]he acts proscribed in [N.C. Gen. Stat.] § 58–63–15(11) were designed to protect the consuming public" based on the determination

---

[4]    Defendants also argue plaintiff has not offered evidence showing damages. Because the court determines plaintiffs have not demonstrated an unfair or deceptive practice, it does not reach the question of damages.

15

that the specified conduct is "inherently unfair, unscrupulous, immoral, and injurious to consumers." Id. at 70-71. In considering the intersection between North Carolina General Statute § 75-1.1 and § 58-63-15(11), the Fourth Circuit has explained:

> North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, prohibits unfair and deceptive acts or practices, generally, and North Carolina's "Unfair Claim Settlement Practices" statute, N.C. Gen. Stat. § 58-63-15(11), defines unfair practices in the settlement of insurance claims. As relevant here, § 75-1.1 provides a private cause of action for violations, whereas § 58-63-15(11) does not; instead "the remedy for a violation of section 58-63-15 is the filing of a section 75-1.1 claim." Country Club of Johnston Cty., Inc. v. U.S. Fid. & Guar. Co., 150 N.C. App. 231, 244 (2002). Thus, an individual may file an independent § 75-1.1 claim, or may file a § 75-1.1 claim that relies on a violation of § 58-63-15(11).

Elliott v. Am. States Ins. Co., 883 F.3d 384, 396 (4th Cir. 2018).

Courts applying the UDTPA "differentiate between contract and deceptive trade practice claims, and relegate claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement to the arena of contract law." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir.1998). Therefore, it is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." Strum v. Exxon Co., U.S.A., 15 F.3d 327, 333 (4th Cir.1994). "[C]onduct carried out pursuant to contractual relations rarely violates the [UDTPA]." S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 536 (4th Cir. 2002). "In fact, even an intentional breach of contract . . . must be particularly egregious to permit recovery under North Carolina's [UDTPA]." Id.

Plaintiff asserts that defendants' choice to settle the underlying action within plaintiff's deductible amounts to "an inequitable assertion of power or position." See Gray 352 N.C. at 68. However, defendants' decision to exercise their contractual right to effectuate settlement to avoid

16

the risk presented by a jury verdict is not inherently inequitable.

As discussed above, "an insurer may act in its own interest in settlement of [a] claim." Cash, 137 N.C. App. at 205. Courts applying North Carolina law have upheld this principle when an insurer settled within its insured's deductible, Mod. Auto. Network, LLC v. E. Alliance Ins. Co., 416 F. Supp. 3d 529, 548 (M.D.N.C. 2019), aff'd, 842 Fed. App'x 847, 850 (4th Cir. 2021), and when an insurer settled claims which were apparently fraudulent, Cash, 137 N.C. App. at 205. This court also "see[s] no indication that North Carolina courts would hold that an insurer may consider its own interest in settling a claim under insurance law yet find such conduct to amount to a violation of the UDTPA." Mod. Auto. Network, 842 Fed. App'x at 852.

Accordingly, the court concludes there has been no violation of the UDTPA, and defendants are entitled to summary judgment as to this count.

          d.          Counterclaim

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of the contract." Wells Fargo Ins. Serv. USA, Inc. v. Link, 372 N.C. 260, 276 (2019). The parties here do not dispute the validity of the policy. As discussed above, the policy requires plaintiff to "reimburse [defendants] up to the Deductible Amount for any amounts [defendants] have paid under this policy." (DE 1-1 at 147). Defendants paid $2.5 million to settle the Eckerts' claims against plaintiff under the policy, and plaintiff has not reimbursed defendants for that payment. Therefore, based on the undisputed facts, plaintiff has breached the terms of the policy. Accordingly, defendants are entitled to summary judgment on their counterclaim.

B.     Motions to Exclude

Plaintiff moves to strike and exclude testimony of defendants' expert witness, Stephen. Where neither defendants nor the court rely upon testimony of Stephen for summary judgment

purposes, plaintiff's motion is terminated as moot.

Defendants move to strike and exclude testimony of plaintiff's rebuttal expert witnesses, Ticer and Miller. Plaintiff relies on Ticer's testimony in its response to the instant motion for summary judgment. However, because the court's above analysis does not rely on either purported expert's testimony and because grant of defendants' motion for summary judgment obviates need for trial, those motions are terminated as moot.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 39) is GRANTED, and the parties' motions to exclude the testimony and opinions of certain experts (DE 33, 35, 37) are TERMINATED as MOOT. The clerk is DIRECTED to close this case.

SO ORDERED, this the 14th day of July, 2025.

                                                LOUISE W. FLANAGAN
                                                United States District Judge